2016 ND 231

**Rebecca Marie SCHWEITZER, Plaintiff and Appellee**

v.

**Ethan Robert MATTINGLEY, Defendant and Appellant.**

No. 20160090.

Supreme Court of North Dakota.

Dec. 5, 2016.

Michael S. McIntee, Towner, N.D., for plaintiff and appellee.

Robert S. Rau, Minot, N.D., for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Ethan Mattingley appeals a district court judgment awarding Rebecca Schweitzer primary residential responsibility of their minor child and ordering Mattingley to pay child support. We affirm in part and reverse in part.

I

[¶ 2] Mattingley and Schweitzer have one minor child, born in 2012. Schweitzer lives in Minot and Mattingley lives in Velva, approximately 22 miles southeast of Minot. Mattingley works in Minot and drives round trip from Velva to Minot every day. After the child's birth he lived primarily with Schweitzer, and Mattingley paid child support under an earlier district court judgment.

[¶ 3] In 2014 both parties sought primary residential responsibility of the child. The district court, through Judge Hagar, entered an interim order in February 2015 establishing parenting time and requiring Mattingley to pay $970 per month in child support. Approximately one month after entry of the interim order, Mattingley moved to modify child support, alleging his work hours decreased and overtime was not guaranteed. While the motion was pending, Mattingley moved to recuse Judge Hagar, alleging Judge Hagar was biased or prejudiced against Mattingley or his attorney. In June 2015, Judge Hagar entered an order decreasing Mattingley's child support obligation from $970 to $891 per month effective March 1, 2015. In July 2015, Judge Hagar denied Mattingley's motion to recuse, but subsequently disqualified himself from the case on the same day.

[¶ 4] Judge Louser was assigned to the case and presided over a September 2015 trial. Before trial, Judge Louser informed the parties she intended to "proceed anew on all issues raised in the initial pleadings" including primary residential responsibility and child support. After trial, Judge Louser informed the parties of a personal conflict and requested the case be assigned to another judge.

[¶ 5] Presiding Judge Lee assigned himself to the case and after familiarizing himself with the record and evidence submitted at trial, awarded primary residential responsibility of the child to Schweitzer and established parenting time for Mattingley. The court found it was in the child's best interests to live with Schweitzer in Minot where the child will be attending school.

[¶ 6] Judge Lee also addressed Mattingley's motion to recuse and concluded it divested Judge Hagar of authority to proceed in the case. The court vacated Judge Hagar's order modifying child support and reinstated the $970 per month of child support under the February 2015 interim order. Using the evidence from trial, the court found Mattingley's yearly income was $78,600 and ordered him to pay $891 per month in child support effective September 1, 2015, and $836 per month effective November 1, 2015.

[¶ 7] After filing his notice of appeal, Mattingley moved to modify child support because he lost his job in March 2016. After a hearing the district court reduced Mattingley's child support obligation to $440 per month effective April 1, 2016.

## II

[¶ 8] Mattingley argues the district court erroneously calculated child support. He also argues the court erred in vacating the June 2015 order modifying child support.

[¶ 9] Child support decisions involve questions of law subject to a de novo standard of review, findings of fact subject to a clearly erroneous standard of review, and in some limited areas may be matters of discretion subject to an abuse-of-discretion standard of review. *Berge v. Berge*, 2006 ND 46, ¶ 7, 710 N.W.2d 417.

### A

[¶ 10] Mattingley argues Judge Lee erred in vacating Judge Hagar's June 2015 order modifying his child support obligation from $970 to $891 per month.

[¶ 11] Mattingley filed a motion to recuse Judge Hagar before entry of the June 2015 order modifying child support. Mattingley alleged that on the basis of the rulings in the case, Judge Hagar exhibited bias or prejudice against Mattingley or his attorney. Mattingley also alleged Judge Hagar may be biased against his attorney on the basis of his attorney's earlier cases with Judge Hagar. Judge Hagar denied Mattingley's motion to recuse, concluding his allegations of bias were without merit. On the same day Judge Hagar denied Mattingley's motion, he disqualified himself from the case without explanation.

[¶ 12] The law presumes judges are unbiased, and adverse or erroneous rulings do not, by themselves, demonstrate bias. *Rath v. Rath*, 2016 ND 105, ¶ 13, 879 N.W.2d 735. "When making a recusal decision, a 'judge must determine whether a reasonable person could, on the basis of all the facts, reasonably question the judge's impartiality.'" *Rath v. Rath*, 2016 ND 46, ¶ 31, 876 N.W.2d 474 (quoting *Datz v. Dosch*, 2014 ND 102, ¶ 16, 846 N.W.2d 724). A district court's decision on a motion for recusal is reviewed for an abuse of discretion. *Rath*, 2016 ND 46, ¶ 31, 876 N.W.2d 474.

[¶ 13] A review of the record here does not indicate Judge Hagar abused his discretion in denying Mattingley's motion to recuse, and Judge Hagar's subsequent self-disqualification may have been unnecessary. *See Rath*, 2016 ND 46, ¶ 31, 876 N.W.2d 474 (While a judge has a duty to recuse when required by the Code of Judicial Conduct, a judge also has an equally strong duty not to recuse when the facts do not require recusal.).

[¶ 14] After assigning the case to himself, presiding Judge Lee addressed Mattingley's motion to recuse and concluded the motion operated as a demand for change of judge under N.D.C.C. § 29–15–21, which disqualified Judge Hagar from acting further in the case. Judge Lee vacated the order modifying child support, concluding Judge Hagar lacked authority to proceed in the case after Mattingley filed his motion to recuse.

[¶ 15] Section 29–15–21, N.D.C.C., relating to a demand for change of judge, does not apply here. Mattingley did not file his motion for recusal under N.D.C.C. § 29–15–21, he did not cite N.D.C.C. § 29–15–21 in his motion or supporting brief, and by plain terms N.D.C.C. § 29–15–21 does not apply due to the timing of Mattingley's motion. Unlike a demand under N.D.C.C. § 29–15–21, a district court judge is not immediately divested of authority upon the filing of a motion to recuse. *See Rath*, 2016 ND 105, ¶ 13, 879 N.W.2d 735; *Datz*, 2014 ND 102, ¶ 16, 846 N.W.2d 724. Judge Lee erroneously vacated Judge Hagar's June 2015 order modifying child support. We reverse and direct entry of the June 12, 2015, order modifying child support requiring Mattingley to pay child support of $891 per month from March 1, 2015 to August 31, 2015.

B

[¶ 16] Mattingley argues the district court failed to follow the law and miscalculated child support. He argues that in finding his income, the court erroneously used an averaging method and failed to consider his overtime pay was not guaranteed.

[¶ 17] Under the child support guidelines, "[i]ncome must be sufficiently documented through the use of tax returns, current wage statements, and other information to fully apprise the court of all gross income." N.D. Admin. Code § 75–02–04.1–02(7). "If circumstances that materially affect the child support obligation have changed in the recent past or are very likely to change in the near future, consideration may be given to the new or likely future circumstances." N.D. Admin. Code § 75–02–04.1–02(8). "Each child support order must include a statement of the net income of the obligor used to determine the child support obligation, and how that net income was determined." N.D. Admin. Code § 75–02–04.1–02(10). A proper finding of net income is essential to calculate the correct amount of child support under the child support guidelines, and as a matter of law, a district court must clearly set forth how it arrived at the amount of income and support. *Berge*, 2006 ND 46, ¶ 8, 710 N.W.2d 417.

[¶ 18] At trial the district court requested Mattingley's pay stubs for a full year from September 2014 through August 2015. The court also requested the parties to submit child support calculations using the pay stubs as evidence of income. Mattingley testified he gets paid every two weeks, or 26 times per year. He also testified his overtime pay had been decreasing and was not guaranteed due to the decline in the oil and gas industry. Mattingley submitted 26 pay stubs; however, his pay stub dated December 26, 2014, was included twice. The 25 remaining pay stubs cover Mattingley's work

from August 17, 2014, to August 1, 2015, with the last pay stub dated August 7, 2015.

[¶ 19] In the parties' calculations of Mattingley's income and child support, Schweitzer recognized Mattingley did not submit his final pay stub dated August 21, 2015. Schweitzer used $2,994.58 as Mattingley's income for the final pay period, which she calculated by averaging his 2015 year-to-date gross income. Schweitzer calculated Mattingley had a total gross income of $80,563.04. Mattingley calculated his gross income to be $76,642, but he did not explain how he arrived at that amount. The district court found Mattingley's gross income to be $78,600, acknowledging the parties differed in their calculations:

> The different (sic) between the two numbers arises primarily from disputes and arguments over overtime pay, and other incidentals.
>
> . . . .
>
> The difference between the two figures is $3,921.00. The Court finds that Ethan Mattingley's income is approximately $78,600.00, this is halfway between the two calculation figures provided. A dollar amount which is within the range of the evidence presented is not clearly erroneous.

Using $78,600 as Mattingley's income, the court calculated $891 per month in child support effective September 1, 2015, and $836 per month effective November 1, 2015. Under the child support guidelines, the November 1, 2015, reduction resulted from Mattingley's girlfriend giving birth to a child in October 2015.

[¶ 20] This Court has not held a district court may calculate a party's income for child support purposes by simply choosing an amount within the range of evidence presented. However, in this case it appears the court deviated from

Schweitzer's calculation of $80,563.04 by giving some credence to Mattingley's testimony regarding overtime and the uncertainty in the oil and gas industry. *See* N.D. Admin. Code § 75–02–04.1–02(8) (courts may consider new or likely future circumstances in determining income). The court indicated Mattingley's overtime pay was a reason the parties differed in their calculations of his income. Mattingley's testimony and pay stubs reflect a decrease in his overtime pay from 2014 to 2015. On this record, we cannot conclude the court erred as a matter of law by using $78,600 as Mattingley's income. We affirm the court's finding of Mattingley's income and child support obligation of $891 per month effective September 1, 2015, and $836 per month effective November 1, 2015, through March 31, 2016.

### III

[¶ 21] Mattingley argues the district court clearly erred in its award of primary residential responsibility to Schweitzer.

[¶ 22] A district court's award of primary residential responsibility is a finding of fact reviewed under the clearly erroneous standard of review. *Smith v. Martinez*, 2011 ND 132, ¶ 3, 800 N.W.2d 304. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if on the entire record this Court is left with a definite and firm conviction a mistake has been made. *Sweeney v. Kirby*, 2015 ND 148, ¶ 7, 864 N.W.2d 464. "We do not reweigh the evidence or reassess the credibility of witnesses, and we will not substitute our judgment for a district court's decision on . . . primary residential responsibility merely because we might have reached a different result." *Id.* A court must award

primary residential responsibility in light of the child's best interests, considering all the relevant best interest factors under N.D.C.C. § 14–09–06.2(1):

a. The love, affection, and other emotional ties existing between the parents and child and the ability of each parent to provide the child with nurture, love, affection, and guidance.

b. The ability of each parent to assure that the child receives adequate food, clothing, shelter, medical care, and a safe environment.

c. The child's developmental needs and the ability of each parent to meet those needs, both in the present and in the future.

d. The sufficiency and stability of each parent's home environment, the impact of extended family, the length of time the child has lived in each parent's home, and the desirability of maintaining continuity in the child's home and community.

e. The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

f. The moral fitness of the parents, as that fitness impacts the child.

g. The mental and physical health of the parents, as that health impacts the child.

h. The home, school, and community records of the child and the potential effect of any change.

i. If the court finds by clear and convincing evidence that a child is of sufficient maturity to make a sound judgment, the court may give substantial weight to the preference of the mature child. The court also shall give due consideration to other factors that may have affected the child's preference, including whether the child's preference was based on undesirable or improper influences.

j. Evidence of domestic violence.

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular parental rights and responsibilities dispute.

[¶ 23] Here, the district court addressed each of the best interest factors under N.D.C.C. § 14–09–06.2(1), finding factors (c) and (d) favored Schweitzer, factors (b) and (e) favored Mattingley, and the remaining factors favored each party equally or had no application. The court found it was in the child's best interests to live with Schweitzer in Minot where the child will soon be attending school.

[¶ 24] Mattingley argues the district court erred in finding factors (c) and (d) favored Schweitzer. He argues the court focused too heavily on the 22–mile drive from Velva to Minot in awarding Schweitzer primary residential responsibility. He argues there is no evidence showing the drive from Velva to Minot negatively impacts the child.

[¶ 25] Under factor (c), a district court considers "[t]he child's developmental

needs and the ability of each parent to meet those needs, both in the present and in the future." N.D.C.C. § 14–09–06.2(1)(c). The court found the parties agreed the child will attend school in Minot. The court found if the child lived with Mattingley in Velva, he will have to wake up early and attend before and after school programs to accommodate Mattingley's work schedule. The court found if the child lives in Minot, he will have a regular and steady school schedule without having to attend before and after school care programs.

[¶ 26] Factor (d) considers "[t]he sufficiency and stability of each parent's home environment, the impact of extended family, the length of time the child has lived in each parent's home, and the desirability of maintaining continuity in the child's home and community." N.D.C.C. § 14–09–06.2(1)(d). The district court stated factor (d) favored Schweitzer:

> Looking to the future, however, the Court focuses again on the child's school needs. It is far better, in the Court's opinion, to maintain continuity within the home which is closest to the school which the child will be attending. He will no doubt have friends and companions in the school and in the neighborhood. After school activities will be more readily available if the child lives in Minot, near his school. He will be able to come home immediately after school, rather than wait in some after school program and then face the half hour car ride [to Velva].

[¶ 27] The district court stated its decision was a close call, but the child's best interests looking to the future tipped the balance in Schweitzer's favor:

> [The child] will soon enter full time school. The parties agreed he should attend school in Minot. If he attends school in Minot, he should live in Minot.

As the testimony established, any equally shared parenting time arrangement, or any other plan which awards primary residential responsibility to Ethan Mattingley would place the child at least 22 miles from Minot for a large portion of the school year. This would mean that the child would have to wake earlier each school morning, and ride approximately a half hour each morning to a day care. At the end of the school day he would be in an after school care setting for a number of hours, and would then have another half hour or so ride in a car. The Court sees no reason to impose this burdensome schedule on [the child] when there is a warm and loving home in Minot where the child can reside without the extra travel, preschool care or after school care.

[¶ 28] The district court indicated both parents love and have a close relationship with the child, and provide a healthy, secure loving environment. The court found the child's best interests were better served living with Schweitzer in Minot, specifically during the school year. District courts often have to make close calls in these types of cases, and this Court will not reweigh the evidence or substitute the district court's judgment with our own. *Sweeney*, 2015 ND 148, ¶ 7, 864 N.W.2d 464. On this record, there is evidence to support the district court's findings and we cannot conclude the court clearly erred in awarding Schweitzer primary residential responsibility. We are not left with a definite and firm conviction a mistake has been made.

## IV

[¶ 29] Mattingley argues Judge Lee did not fully comply with N.D.R.Civ.P. 63 after Judge Louser disqualified herself. Mattingley argues Judge Lee did not certi-

fy he could complete the case without prejudice to the parties. We disagree.

[¶ 30] Rule 63, N.D.R.Civ.P., provides a successor judge may proceed in a case "upon certifying familiarity with the record and determining that the case may be completed without prejudice to the parties." In his findings of fact, conclusions of law, order for judgment, and judgment, Judge Lee addressed N.D.R.Civ.P. 63:

> The Court hereby certifies that it has reviewed the pleadings, motion, and exhibits filed in this action. The Court has further listened to the audio recording of hearings made in the action.
>
>     . . . .
>
> From a review of the relevant portions of the record and prior proceedings, and further with the consent of the parties, this Court is confident and hereby certifies that it can fairly and intelligently rule on all issues presented in the case.

While Judge Lee did not specifically state he could complete the case without prejudice to the parties, we conclude his statement that he "can fairly and intelligently rule on all issues" complied with N.D.R.Civ.P. 63.

### V

[¶ 31] The judgment is affirmed in part and reversed in part.

[¶ 32] GERALD W. VANDE WALLE, C.J., LISA FAIR McEVERS, DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.